Deborah MARSH Appellant

v.

MERCER TRANSPORTATION, Robert L. Whittaker, Director of Special Fund; Richard H. Campbell, Jr., Administrative Law Judge; and Workers' Compensation Board Appellees

No. 2001–SC–0580–WC.

Supreme Court of Kentucky.

June 13, 2002.

Eric M. Lamb, Lamb & Lamb, Louisville, Counsel for Appellant.

David R. Allen, John William Burrell, Frankfort, Counsel for Special Fund.

W. Kenneth Nevitt, Nevitt Law Office, Louisville, Counsel for Mercer Transportation.

## OPINION OF THE COURT

In a two-to-one decision, the Court of Appeals has vacated a finding concerning the average weekly wage of a truck driver whose earnings were based upon a percentage of the gross revenue that her truck generated and remanded the claim for a determination under KRS 342.140(1)(f). Appealing, the claimant maintains that substantial evidence supported the finding under the criteria that are set forth in KRS 342.140(1)(f) and that the Court of Appeals' decision to vacate the finding addressed an error that the employer failed to preserve.

The claimant and her husband worked together as over-the-road truck drivers, sharing equally in the duties that the job entailed and often working a 15–hour day. Although it was undisputed that they were to be considered employees for the purposes of workers' compensation, they owned the truck that they drove and were responsible for the expenses of operating it. They filed a Schedule C and reported their net profit for income tax purposes. The claimant began working for the employer on July 26, 1995. On July 2, 1996, she fractured both ankles while working. She was paid temporary total disability (TTD) benefits at the rate of $186.11 per week from July 3, 1996, through November 10, 1996. Although she returned to work thereafter, she was unable to assume her full share of the workload.

The parties were unable to agree to the claimant's average weekly wage. Her husband, Fred Marsh, testified that in the seven months of 1993 that he had driven a truck as a non-owner, he was paid $25,322.00. He testified that WalMart had offered him $50,000.00 per year in a similar capacity and that his son earns $27,000.00 as a beginning truck driver. Furthermore he introduced the couple's joint tax returns for 1993 and for the years 1995–1998.

Mr. Gary Wilmoski testified on behalf of the employer, indicating that a truck driver's earnings depend upon the gross revenue that the truck generates. He explained that the employer pays drivers who own their own vehicles 75% of the gross and that their net after paying expenses is approximately 25% of the gross. Thus, an owner's earnings from driving a truck that generates $100,000.00 in annual revenue would be approximately $25,000.00. He testified that 25% of gross revenue is also the average amount that truck owners pay to a driver and is the basis upon which workers' wages are reported for the purpose of determining workers' compensation premiums. He explained that where there is a team of two drivers, each individual's earnings would equal half of that amount. Based upon

12.5% of the revenue that the claimant's truck generated, he indicated that her average weekly wage in the best quarter before her injury was about $279.00. On cross-examination, he testified that most non-owner drivers earn between $25-30,-000.00 per year. When asked to explain why he had ascribed what would amount to a much lower annual wage to the claimant, he indicated that she didn't make as many hauls.

When briefing the matter of average weekly wage to the Administrative Law Judge (ALJ), the claimant maintained that KRS 342.140(1)(a)-(e) were inapplicable and that the calculation should be made under KRS 342.140(1)(f) because an hourly wage was not fixed and could not be ascertained. Nonetheless, she also maintained that certain items that were deductible as business expenses on her Schedule C (meals and accelerated depreciation on the truck) should not be deducted from her share of the 75% of gross receipts when calculating her average weekly wage. She explained that unlike the amounts deducted for fuel and the other direct expenses of operating the truck, the amounts deducted for meals and depreciation represented income that was available to her to spend at her discretion.

The employer suggested three possible methods for calculating the claimant's average weekly wage. First, the claimant's half of the net profit that was reported as income for tax purposes during the year preceding the injury could be divided by the number of weeks that she worked to arrive at an average weekly wage of $162.99. Second, based upon Mr. Wilmoski's testimony, half of 25% of the truck's gross revenue would result in an average weekly wage of $279.45, the figure that the employer had used when calculating the amount of TTD benefits. The employer also maintained that the figure was consis-tent with an Attorney General opinion to the effect that where a school board hired employees as bus drivers and also contracted with workers who furnished their own buses, the average weekly wage of the independent contractors should be the same as that of the employees for compensation purposes. Finally, the employer indicated that half of the 75% of the truck's gross could be divided by the number of weeks but that the resulting figure would be inappropriate because it would include the expenses of operating the truck.

The ALJ subsequently awarded the claimant a 42% permanent, partial disability. Her income benefit was based upon an average weekly wage of $589.18 ($30,-637.36 per year), with the ALJ concluding that the amount represented the claimant's wage-earning capacity at the time of her injury. This figure was reached by adding back to the net profit from operating the truck (as shown on the Schedule C and reported as income on the Form 1040), the depreciation allowance and the meal expense that had been deducted as expenses on the Schedule C and assigning half of the total to the claimant. Taking into account the fact that the claimant had been employed for 48.857 weeks before being injured, the ALJ prorated the figures for net profit, meals, and depreciation from the claimant's 1995 and 1996 tax returns.

Petitioning for reconsideration, the employer repeated its previous arguments, maintaining that the correct figure was either $279.45 or $162.99. Furthermore, the employer asserted that the ALJ's calculation was based upon income that was earned during 1995 before the employment commenced. The petition was overruled, after which the employer appealed.

Affirming the decision, the Workers' Compensation Board (Board) noted the employer's argument that KRS 342.140(1)(f) should have been used and

that according to Mr. Wilmoski's explanation of the method for calculating a non-owner driver's wage, the claimant's average weekly wage was $279.45. Although the Board agreed that it was appropriate to use KRS 342.140(1)(f) on these facts, it concluded that the ultimate figure that the ALJ had reached was correct. The Board pointed out that Wilmoski's testimony was not uncontradicted, noting that Fred Marsh had testified concerning the wages of non-owner truckers and that the ALJ's figure was consistent with Marsh's testimony. Pointing out that the ALJ did not rely upon the evidence concerning the usual wage for similar services when such services are rendered by paid employees, the Court of Appeals vacated the finding and remanded the matter for a determination in accordance with KRS 342.140(1)(f).

A review of the parties' arguments throughout the litigation of this claim reveals that they have never disputed the applicability of KRS 342.140(1)(f) to the claimant's average weekly wage calculation. Both have maintained that it applies and have introduced evidence concerning the wages of non-owner drivers, but they have also introduced evidence that pertained to the claimant's unique situation. KRS 342.140 provides, in pertinent part, as follows:

> The average weekly wage of the injured employee at the time of the injury or last injurious exposure shall be determined as follows:
>
> (1) If at the time of the injury which resulted in death or disability or the last date of injurious exposure preceding death or disability from an occupational disease:
>
> . . .
>
> (d) The wages were fixed by the day, hour, or by the output of the employee, the average weekly wage shall be the wage most favorable to the employee computed by dividing by thirteen (13)

the wages (not including overtime or premium pay) of said employee earned in the employ of the employer in the first, second, third, or fourth period of thirteen (13) consecutive calendar weeks in the fifty-two (52) weeks immediately preceding the injury.

> . . .
>
> (f) The hourly wage has not been fixed or cannot be ascertained, the wage for the purpose of calculating compensation shall be taken to be the usual wage for similar services where the services are rendered by paid employees.

The purpose of KRS 342.140 is to estimate the injured worker's earning capacity, an estimate that generally is based upon the worker's pre-injury earnings. Where wages are paid by the year, month, week, day, hour, or output, and the employment is longstanding, the calculation of average weekly wage is based upon the worker's actual pre-injury earnings, is purely mathematical, and requires little, if any, discretion on the part of the fact-finder. In contrast, where the duration of the employment is less than 13 weeks or where the worker's earnings are affected by the availability of work, the pre-injury earnings may not represent a realistic estimate of the worker's earning capacity. In such instances, KRS 342.140(1)(e) permits the ALJ to consider other factors. See, for example, *Huff v. Smith Trucking*, Ky., 6 S.W.3d 819 (1999), and *C & D Bulldozing v. Brock*, Ky., 820 S.W.2d 482 (1991). Likewise, when the worker's hourly wage cannot be ascertained, KRS 342.140(1)(f) directs the ALJ to consider the wage of paid employees who perform similar services instead of the injured worker's actual earnings.

KRS 342.140(1)(f) looks to the usual earnings of "paid employees" who provide "similar services." Under those circumstances, questions concerning what expenses should be deducted from an em-

ployee-entrepreneur's gross receipts in order to determine the individual's earnings from the venture are immaterial. Nonetheless, the concept that a worker's average weekly wage is sometimes a function of the individual's productivity is clearly recognized in KRS 342.140(1)(d). For that reason, we are aware of nothing that would prevent the ALJ from concluding that the earnings of an over-the-road truck driver who is a paid employee are a function of the gross revenue that the driver's truck generates. Likewise, if supported by the evidence, an ALJ might also be free to determine that such workers are paid on another basis.

█ In the instant case, Mr. Wilmoski testified that a non-owner driver is paid 25% of the gross and that a team driver of a truck with gross revenues that equaled the claimant's would earn an average weekly wage of $279.45. He testified that most non-owner drivers earned $25–30,-000.00 per year and, therefore, earned a much greater average weekly wage than the claimant. However, he also indicated that they made more hauls than the claimant did. Whereas, the claimant offered evidence that non-owner drivers earned in the range of $25,322.00 to $50,000.00.

The parties do not dispute that KRS 342.140(1)(f) applies to these facts. Having considered the manner in which the claimant's average weekly wage was calculated, it is apparent that the ALJ did not apply KRS 342.140(1)(f). For that reason, we agree with the Court of Appeals that a remand for a consideration of the evidence under KRS 342.140(1)(f) is required.

The decision of the Court of Appeals is affirmed.

All concur.